I. D. Blumenthal and Madolyn C. Blumenthal v. Commissioner.
Blumenthal v. Commissioner
Docket No. 89904.
United States Tax Court
T.C. Memo 1963-269; 1963 Tax Ct. Memo LEXIS 75; 22 T.C.M. (CCH) 1360; T.C.M. (RIA) 63269; September 30, 1963
*75 1. Legal expenses paid in 1956 and 1957 were directly related to petitioner's acquisition of an interest in a corporation, and cannot be deducted from ordinary income. 2. No "Bad Debt" deductions are allowable as to loans that are worthless when made. Richard E. Thigpen, 129 West Trade St., Charlotte, N.C. and Richard E. Thigpen, Jr., for the petitioners. Wallace E. Whitmore, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion *76 FORRESTER, Judge: Respondent has determined deficiencies in petitioners' income taxes for the calendar years 1956 and 1957 in the amounts of $10,230.47 and $762.72, respectively. Petitioners assert an overpayment in such taxes for the year 1957 in the amount of $589. The issues remaining for our decision are (1) whether petitioners are entitled to deductions in respect of legal expenses paid in 1956 and 1957, and (2) whether petitioners are entitled to deductions with respect to alleged worthless nonbusiness debts in 1956 and a carry forward therefrom in 1957. Findings of Fact Some of the facts have been stipulated and are so found. The petitioners *77 are individuals, husband and wife, residing at Charlotte, North Carolina. For the taxable years 1956 and 1957 they filed joint Federal income tax returns, computed on the cash basis, with the district director of internal revenue at Greensboro, North Carolina. Petitioner I. D. Blumenthal will be referred to hereinafter as the petitioner. Issue 1 Petitioner has been active in the operation of Radiator Specialty Company of Charlotte, North Carolina, a manufacturer of chemical and rubber goods for the automotive and plumbing trades, since acquiring a 50 percent interest therein about 40 years ago. This company has been expanded by petitioner and his co-owner since that time into a nationwide business, with a branch in Canada, some exports to foreign countries, and a present annual sales volume of around $8,000,000. On October 1, 1948, petitioner contracted to purchase from Leon and Bertha Reiner a one-half interest in L. & B. Reiner, Inc., of New York, evidenced by 45 shares of the corporation's capital stock. The purchase price agreed upon was $190,000. L. & B. Reiner, Inc., is a corporation having its principal place of business in New York City. It was engaged in the business *78 of selling medical equipment and supplies. In 1948, and at all times material to the issues in this case, its capital stock consisted of 90 shares of common stock, all of which were outstanding. Petitioner had known Leon Reiner (hereinafter sometimes referred to as Reiner) for a number of years, and Reiner was anxious to have petitioner become interested in L. & B. Reiner, Inc. (hereinafter sometimes referred to as the Corporation), because of petitioner's success in building up Radiator Specialty Company. Petitioner had made an investigation of the Corporation and decided that the business was promising, that Reiner did not know how to run the business properly, and that through petitioner's knowledge and ability the business could be substantially expanded. As provided in his 1948 agreement with the Reiners, petitioner paid $50,000 in cash on October 1, 1948, and executed 20 promissory notes for the $140,000 balance of the purchase price. The notes, the last of which was to become due October 1, 1958, included interest to the respective due dates (providing for no interest otherwise), and consequently totaled $186,200.91. Forty-five shares of common stock were transferred to *79 petitioner, who in turn assigned them back to the Reiners, subject to the agreement, as collateral security for the notes. The agreement provided that petitioner was to become executive vice-president of the Corporation at an annual salary of $12,000, and that bonuses would be paid beginning with the fiscal year ending September 30, 1949. After October 1948, petitioner saw Reiner about every month, spending from 2 days to a week at a time advising, consulting, and planning as to how to operate the business, determining the territories, commissions and incentives for salesmen, and devoting much of his time and knowledge generally to expanding the business of the Corporation. Petitioner has always maintained that he had an oral understanding with Reiner that he was not to make payments on the 20 notes, but that any payments to which he was entitled from the Corporation in the form of salary, bonuses, or a sharing of the profits would be applied against the notes. On a number of occasions following petitioner's stock purchase in 1948, he communicated with Reiner in an effort to get the 20 notes returned to him so that they would not appear to be liabilities outstanding. By letter *80 of December 14, 1949, petitioner advised Reiner that the bank with which he did business had told him he could not get any further credit because he had overstepped his bounds by giving the Reiners the notes and was thus placed in a precarious financial position. Notwithstanding petitioner's continued requests to Reiner for return of the notes, the relief was not granted until a new agreement was reached between petitioner and the Reiners on January 23, 1951. By that time legal proceedings had been commenced by Reiner to collect on the notes. The new agreement (hereinafter sometimes referred to as the 1951 agreement) provided in material part as follows: 1. (a) The agreement between the parties heretofore executed and dated October 1, 1948 is hereby terminated and cancelled and shall be void and of no further effect. (b) All promissory notes executed by Blumenthal, pursuant to the terms of said agreement, shall be cancelled and returned to Blumenthal. 2. The sum of $158,900.00, representing the unpaid balance of the purchase price for forty-five (45) shares of the common stock of the Corporation sold by Leon Reiner and Bertha Reiner to Blumenthal pursuant to the terms of *81 the aforesaid agreement, shall be paid as follows: (a) Simultaneously with the execution of this agreement, Blumenthal will pay to Leon Reiner and Bertha Reiner jointly the sum of $25,000.00. (b) Simultaneously with the execution of this agreement, Blumenthal will execute and deliver to Leon Reiner and Bertha Reiner two (2) promissory notes payable to their order with interest at three (3%) per cent per annum as follows: one note in the face amount of $10,000.00 payable on November 15, 1951 and one note in the face amount of $15,000.00 payable on November 15, 1952. Said notes shall provide that in the event the note first due is not paid on its due date, then the second note shall forthwith become due and payable. (c) In the event of a default in the payment of either of the aforesaid notes, Leon Reiner and Bertha Reiner jointly shall forthwith be deemed to have purchased the said forty-five (45) shares of stock now owned by Blumenthal in the same manner as if an offer to sell the same had been made by Blumenthal at the book value thereof. The obligation of Blumenthal to pay the amounts set forth in said notes, together with interest, shall nevertheless survive, Blumenthal shall *82 continue liable therefor and Leon Reiner and Bertha Reiner may institute any action at law or otherwise to enforce collection of same. (d) The balance of $108,900.00 with interest at three (3%) per cent from the date hereof shall thereafter be payable only out of dividends paid on the corporate stock now owned by Blumenthal, corporate salaries and bonuses or any other sums, if any, that may become due or payable to Blumenthal from the Corporation. Blumenthal does hereby authorize the Corporation to pay over to Leon Reiner and Bertha Reiner jointly all such dividends, salaries and bonuses or any other sums, if any, that may become due and payable to him at any time on or prior to September 1, 1958, to be applied against said balance of $108,900.00 until the same, plus accrued interest at three (3%) per cent, has been fully paid and discharged. * * * 3. Pending payment in full of the balance as aforesaid, Leon Reiner and Bertha Reiner shall hold said forty-five (45) shares of corporate stock now registered in the name of Blumenthal as collateral security for the payment of said sum. * * *
11. The parties acknowledge that except for the obligations created by this instrument *83 neither of the parties have any obligations of any kind or sort to each other, and formal instruments of general release to that effect will be executed and exchanged. Pursuant to the 1951 agreement, petitioner paid the Reiners $25,000 in cash and gave them promissory notes for $10,000 and $15,000, payable on November 15, 1951, and November 15, 1952, respectively. Pursuant to the 1951 agreement, the old shares of stock were replaced by a new certificate. This new certificate was subject to the written agreement of January 23, 1951. In accordance with the agreement, petitioner endorsed the said certificate in blank and it was retained by the Reiners as collateral security. After the execution of the 1951 agreement, petitioner became dissatisfied with the way the business of the Corporation was being run by Reiner. He found that the salesmen and customers were being alienated, and believed the business was going downhill. He consequently refused to make any payments with respect to the two notes totaling $25,000 which he had given the Reiners under the 1951 agreement. The Reiners brought suit against petitioner to collect on these said notes in the United States District Court *84 for the Western District of North Carolina, Charlotte Division. The judgment of the District Court was in favor of the Reiners. ( Reiner v. Blumenthal, (W.D.N.C. 1956) 147 F. Supp. 213.) This judgment was affirmed by the United States Court of Appeals on July 19, 1957. ( Blumenthal v. Reiner, 247 F. 2d 461 (C.A. 4, 1957).) Petitioner sought a writ of certiorari from the United States Supreme Court, which was denied on December 16, 1957 (355 U.S. 903). The two promissory notes over which the litigation arose were a specific part of the purchase price of petitioner's 45 shares of stock in L. & B. Reiner, Inc. The 45 shares of stock were forfeited and resold to Leon and Bertha Reiner in November 1951 upon petitioner's default on the first promissory note. Petitioner incurred and paid attorneys' fees and legal expenses in the amount of $7,570.54 in 1956 and $1,475.23 in 1957 in litigating the claim of the Reiners on the two promissory notes. The legal expenses incurred and paid by petitioner in 1956 and 1957 were directly related to the acquisition by petitioner of his interest in the Corporation. Issue 2 Petitioner was a customer of one *85 Samuel H. Stein, a butcher in Charlotte, North Carolina, whom petitioner had known for a number of years prior to 1938. From time to time petitioner had made loans to Stein, some of which were repaid before 1938. During 1938, when Stein was about 74 years old, he told petitioner that he would like to spend his remaining days in the Holy Land of Palestine and asked whether petitioner would help him out. At that time Stein owed petitioner approximately $1,000. Stein told petitioner he would need about $25 a month and that he had some life insurance policies on his life by virtue of which petitioner could have some security for Stein's obligations. Petitioner agreed to advance Stein $25 a month, and petitioner thereafter held the insurance policies. On July 12, 1939, petitioner wrote to Stein in Palestine regarding their arrangements. This letter read in relevant part as follows: I do not know whether you expect me to continue to send you money or not, or in other words support you, and I understand from your letter that your wife does not have any money or any means of support, because I believe you understand that you owe me more money than your insurance policies will take *86 care of. The records show that you owe me $5,468.72 today, and if your policies were collected in full tomorrow, they would pay only $4,138.94. Now so far as your property is concerned, it was foreclosed by the Building and Loan. I bought it in and paid more for it, or as much as it will ever bring, consequently there is no equity or profit to be expected from that. You mentioned in your letter that you want your will changed, but since there will be nothing to divide, it really does not make much difference. Under the circumstances and since you are now legally married according to the Palestinian law, I would like for you to sign the attached note, which is for the amount you owe me today, and also have your wife sign it so that my records will be clear. Please return this note to me promptly, signed by both you and your wife. Let me know exactly how you want your will changed and I will have it done. I presume you want me to continue to handle your affairs, or in other words retain your power of attorney. I will continue to send you a check each month, as I originally started, but each month, when you acknowledge the check, it will be necessary for you to send me a note *87 covering this amount so I will have my records clear. The note referred to in the letter was returned to petitioner dated December 15, 1939, executed by Stein alone, in the amount of $5,468.72. It was made payable to the Commercial National Bank, Charlotte, North Carolina, as petitioner had erroneously sent Stein one of a number of printed blank notes he had on hand which showed the said bank, with which petitioner regularly did business, as payee. Between July 12, 1939, and Stein's death at the age of 88 in 1952, petitioner sent Stein an additional amount of $3,925 not covered by any notes. During the period following Stein's leaving for Palestine in 1938, petitioner paid premiums totaling $4,125.84 upon the life insurance policies on Stein's life. Petitioner originally thought that the collectible amounts of these policies were more than they turned out to be, but on July 12, 1939, he knew that, due to Stein's borrowing against one or more of the policies, they were less than the total amount of the loan at that time. Petitioner's expectation of repayment of the advances to Stein was solely from the insurance policies. Petitioner was named executor of Stein's estate in *88 Stein's will. In 1952 he probated the will, qualified as executor, and administered the decedent's estate, which was settled in 1956.
Petitioner paid miscellaneous expenses of $23.60 in the administration of the estate. In 1956, petitioner was discharged as executor of Stein's estate when he filed his accounting with the Clerk of Superior Court for Mecklenburg County, North Carolina. The accounting indicated that claims and disbursements totaled $14,543.16, and showed as the only receipts $5,051.37, the proceeds of life insurance policies. The listed claims and disbursements consisted of the following: Note payable to petitioner dated Sep-
tember 1, 1927
$1,000.00
Note payable to petitioner dated De-
cember 15, 1939
5,468.72
Loans from petitioner not covered by
notes
3,925.00
Insurance premiums paid by petitioner
from July 12, 1939 to date of death
4,125.84 These total only $14,519.56, or $23.60 less than the total actually given on the account. Thus, the accounting included as a claim against the estate the $23.60 administrative expenses paid by petitioner, although this claim was not specifically enumerated therein. The claim in the accounting for *89 $1,000 based on a note to petitioner dated September 1, 1927, and $955.91 of the receipts shown upon the collection of the insurance policies, were erroneously included in the accounting. This policy had been collected by 1938 and was considered by Stein and petitioner as offsetting the $1,000 note. As executor of Stein's estate, petitioner disbursed to himself the proceeds of the insurance policies received by the estate to apply against his above-listed claims asserted in the probate proceedings. Opinion Issue 1. Petitioner deducted the full amount of the legal expenses incurred and paid by him in the years 1956 and 1957 on the respective income tax returns for those years. These deductions were disallowed by respondent. Petitioner asesrts that the expenses in issue were ordinary and necessary expenses paid or incurred for the production of income, and hence deductible under section 212(1) [1] of the Internal Revenue Code of 1954. [2]
*90 It is patent that petitioner entered into the agreements to purchase an interest in the Corporation with an income-producing motive. Respondent asserts, however, that the expenditures in question were made some time after petitioner had ceased to have any interest in the Corporation and were made primarily for the purpose of protecting petitioner's personal assets from further depletion with respect to any claims of the Reiners. He would have us conclude that they therefore constituted personal expenses, deductions for which should be denied pursuant to section 262 of the Code. [3]
Although we may agree with respondent's assessment of the facts involved in this argument, we cannot agree with his conclusion as to the legal consequences thereof. In the recent case of United States v. Gilmore, 372 U.S. 39 (1963), the Supreme Court held, quoting Deputy v. Dupont, 308 U.S. 488, 494, 496, that whether a legal expense is to be said to have a personal or business (i.e. profit-seeking) *91 purpose is determined by "the origin of the liability out of which the expense accrues" or "the kind of transaction out of which the obligation arose." Gilmore involved the deductibility of legal expenses incurred in divorce proceedings. The taxpayer claimed his expenses to be deductible as business expenses since they were incurred primarily to protect his business assets. Applying the test described above, the Court held the expenses to be personal and nondeductible, because they arose from the marital questions involved. The Court said, at 372 U.S. 48: The principle * * * is that the characterization, as "business" or "personal," of the litigation costs of resisting a claim depends on whether or not the claim arises in connection with the taxpayer's profit-seeking activities. It does not depend on the consequences that might result to a taxpayer's * * * property from a failure to defeat the claim * * * Although under the facts in Gilmore the expenses there involved were held to be personal, the language used and the principles applied by the court lead us inescapably to the conclusion that the legal expenses incurred and paid by petitioner herein arose in connection *92 with his efforts to obtain income through the Corporation. Respondent argues that there is no proximate relationship between these expenses and petitioner's transactions regarding ownership of an interest in the Corporation, but with that contention we could not be in more complete disagreement. Respondent argues, alternatively, that deductions with respect to the expenses in question should be denied, even if said expenses are found, as we have found them, to have been incurred in connection with transactions entered into for the production of income. He contends that the expenditures were capital in nature, giving rise merely to an adjustment to basis rather than a deduction from ordinary income. On this point we must agree with respondent. Section 212 originated with section 23 (a)(2) of the Internal Revenue Code of 1939, which was added in 1942 to extend deductions previously allowed only in a "trade or business" context to certain nonbusiness situations. H. Rept. No. 2333, 77th Cong., 2d Sess., p. 74-75 (1942), 1942-2 C.B. 429-430. However, it is clear that the restrictions and limitations applicable to the deductibility of trade or business expenses are also *93 applicable to the expenses covered by section 212(1) and (2). Bowers v. Lumpkin, 140 F. 2d 927 (C.A. 4, 1944); Robert L. Wilson, 37 T.C. 230 (1961), affd. 313 F. 2d 636 (C.A. 5, 1963). One of the principal of such limitations, established beyond the need for citation, is that capital expenditures are not deductible. As we explained in Robert L. Wilson, supra, at 233: A capital expenditure is not regarded as a charge against current income and is not deductible as an "ordinary and necessary expense," * * * Thus, as we said in Carl W. Braznell, 16 T.C. 503, 508 (1951): Our question, then, is whether, on the facts here, the amount paid * * * was of such character as to place it in the same category as expenditures incident or essential to the acquisition, continued ownership and ultimate disposition of the properties, which expenditures are capital in character and are to be taken into account in computing the capital gain or loss in case of a subsequent sale; or whether the payment more nearly resembles, and should fall in the category of, expenditures having to do with the management of the properties and maintenance, *94 upkeep and preservation for the further or subsequent production of income, in which case the expenditure is deductible * * *. We think it is clear in the instant case that the expenses in question were capital in nature. As we view the facts they reveal that the legal proceedings in which the expenses were incurred related directly and solely to the contracts for the purchase of an interest in the Corporation and notes given pursuant thereto as part of the agreedupon purchase price. As such they call for an adjustment to basis rather than an offset against ordinary income. Charlotte M. Douglas, 33 T.C. 349 (1959). [4]
*95 Petitioner has presented no convincing argument to the contrary. He commences by quoting our language in Walter S. Heller, 2 T.C. 371, 374 (1943), to the effect that "Congress intended that some expenditures pertaining to assets of a purely capital nature were to be allowed as deductions from gross income." He makes no attempt to show why the expenses here in question were such expenditures. He then closes by citing two distinguishable cases, Pierce Estates, Inc., 3 T.C. 875 (1944), and Carl W. Braznell, 16 T.C. 503 (1951). The first involved expenses incurred in collecting royalty payments, which were as clearly related to ordinary income items as the expenses here in question are capital in nature. The second, quoted by us above, did not involve expenses leading to either a purchase or sale of property. We hold that the legal expenses incurred and paid by petitioner in 1956 and 1957 were capital in nature and did not constitute items deductible from ordinary income. Issue 2 On the income tax return for the year 1956, petitioner deducted the sum of $9,491.79 as a bad debt. [5]
*96 By his petition he has reduced the amount claimed as bad debt to $9,471.30. This figure also appears to have been arrived at through an error. It is derived in the petition by subtracting the $4,095.46 actually distributed to petitioner from Stein's estate [6] from claims allegedly totaling $13,566.76. But the facts as alleged in the petition and as found by us indicate the maximum gross total of claims against Stein to be only $13,543.16. [7] Therefore, we will consider petitioner's alleged bad debt loss herein to be only $13,543.16 minus $4,095.46, or $9,447.70. *97 Petitioner now concedes that his claims can only be considered as nonbusiness bad debts, thus any deduction is limited by section 166(d)(1)(B) to that allowed for losses on short-term capital assets. [8]
*98 In order to prevail, petitioner has to sustain the burden of proving that the various amounts comprising the alleged gross total of claims against Stein constituted debts, within the meaning of section 166, and that the same became worthless in 1956. [9] The first item to be considered is the note dated December 15, 1939. Respondent asserts that, since this note was by its terms payable to the Commercial National Bank, Charlotte, North Carolina, there is no sufficient evidence for us to find the existence of a debt in that amount to petitioner. We disagree. A note is merely evidence of indebtedness, and we are satisfied by petitioner's explanation that he erroneously sent Stein a blank note payable to the bank instead of to himself. Certainly the letter of July 12, 1939, forwarding the note to Stein so indicates, and we consider Stein's execution of the note to be an acknowledgment of obligation to petitioner in the amount of $5,468.72. We turn, then, to the question of whether these debts represented by the note became worthless in 1956. Respondent argues that, since part of said debts were in excess of the potential proceeds of the *99 insurance policies by July 12, 1939, part of the debts represented by the note sent to Stein on that date for execution were worthless when made. On the state of the record before us we have no choice but to agree with this contention. It is settled law that a loan that is worthless when made can not give rise to a deduction for a bad debt, and that the burden is on petitioner to prove that the debts were not worthless when made. Fred A. Bihlmaier, 17 T.C. 620 (1951). Petitioner knew Stein was an old man in need of financial assistance, and that Stein's wife had no money, and petitioner expected repayment only from the insurance policies. At the time Stein left the country in 1938 he owed petitioner approximately $1,000, and petitioner held the insurance policies. By July 12, 1939, the total of the debts had exceeded the potential proceeds of the policies. But there is no showing that petitioner did not know that the debts were becoming in excess of the collateral at the time the total amount of the debts passed the value of the collateral, or that petitioner reasonably could not have known that such was the case. Avery v. Commissioner, 22 F. 2d 6 (C. *100 A. 5, 1927). Although petitioner originally thought the potential proceeds of the policies were greater than they in fact were, there is no showing as to when before July 12, 1939, petitioner discovered that Stein had borrowed against the policies to reduce their value as collateral. Since petitioner held the policies when Stein left the country, and absent any indication in the record to the contrary, we must assume that Stein's borrowing against the policies occurred prior to petitioner's acceptance of them as collateral; and petitioner must be treated as having made the prompt investigation of the policies that would be made by a reasonable creditor. See Avery v. Commissioner, supra.[10]
Consequently, we cannot hold that those loans included in the $5,468.72 note which were in excess of the potential proceeds of the life insurance policies on Stein's life at the time the loans were made were not worthless when made rather than in 1956. The foregoing disposes as well of the $3,925 item, representing *101 amounts sent to Stein prior to his death but after July 12, 1939, and not represented by notes. There is no showing that any of the advances comprising this item were not worthless when made. The next item involves the insurance premiums, totaling $4,125.84, paid by petitioner with respect to the insurance policies on the life of Stein. The record contains no evidence that petitioner's payments were intended as additional loans to Stein, or that there was any understanding between them concerning the premiums. But even if intended as additional loans, they too were worthless when made and not deductible here as bad debts. First Nat. Bank & Trust Co. of Tulsa v. Jones, 143 F. 2d 652 (C.A. 10, 1944). Petitioner refers us to G.C.M. 14375, XIV-1 C.B. 52, as the only authority cited by him in an effort to support a deduction with respect to this item. This citation is of no benefit to petitioner in this case, however, because, although it takes the position that a deduction should be allowed for premiums paid on a life insurance policy held to secure a debt owned to the taxpayer where there is a right of reimbursement therefor (whether by law or by agreement) *102 and this right is worthless in the year of payment, it states that the year in which such deduction should be taken is the year of payment of such premiums. No premiums were paid by petitioner in the years before us, and we can perceive of no tax relief to which petitioner is entitled in such years. [11]
A deduction for the $23.60 of administration expenses paid in connection with Stein's estate is not strongly urged by petitioner, but *103 the situation with respect to this item is not far different from that involving the insurance premiums. There is nothing in the record to indicate debt which became worthless in the years before us. Consideration of whether a deduction under section 212 should otherwise be allowed is foreclosed by the total failure of proof as to when such expenses were paid. [12]
Decision will be entered under Rule 50. Footnotes
1. SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year - (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income; * * * ↩
2. Unless otherwise noted, all statutory references are to the Internal Revenue Code of 1954.↩
3. SEC. 262. PERSONAL, LIVING, AND FAMILY EXPENSES. Except as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living, or family expenses.↩
4. It might be argued that the legal expenses involved petitioner's sale of his interest, as the resolution of the case brought against petitioner by the Reiners was determined primarily by the trial court's interpretation of the language of paragraph 2(c) of the 1951 agreement, quoted above, involving the Reiners being "deemed to have purchased" petitioner's 45 shares of stock upon his default on the notes. See Reiner v. Blumenthal, 147 F. Supp. 213 (D.C.N.C. 1956). But this distinction would be of no consequence, as the expenses would still constitute a capital offset rather than an offset against ordinary income. Dwight A. Ward, 20 T.C. 332 (1953), affd. 224 F. 2d 547↩ (C.A. 9, 1955).
5. This figure represents the difference between the $14,543.16 shown in the accounting filed in the probate proceedings in connection with Stein's estate as the total of petitioner's claims against the estate, and the $5,051.37 shown in said accounting as the receipts of the estate.↩
6. The accounting stated that the receipts of the estate totaled $5,051.37, but petitioner has admitted and we have found that this figure was overstated therein by the $955.91 proceeds of a life insurance policy collected by 1938 and used to offset the note to petitioner dated September 1, 1927. ↩
7. In the petition it is admitted that the $1,000 note dated September 1, 1927, included as a claim in the probate accounting, is not a part of the bad debt now claimed by petitioner. Thus, based on the facts as alleged and found, petitioner's maximum claim now can be only the total of the $5,468.72 note dated December 15, 1939, the $3,925 sent to Stein after July 12, 1939, not covered by notes, the $4,125.84 life insurance premiums paid by petitioner, and the $23.60 paid by petitioner as expenses in the administration of Stein's estate.↩
8. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts. - When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * *
(d) Nonbusiness Debts. - (1) General rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
9. See sec. 166. Footnote 8, supra.↩
10. It may be observed that, to the extent a creditor is careless about the matter of security, the transaction tends to take on characteristics of gift rather than loan.↩
11. It appears that deductions might have been allowed petitioner in the years of payment of premiums following the effective date of sec. 23(a)(2), I.R.C. 1939, the predecessor of sec. 212(1) and (2), I.R.C. 1954. (See footnote 1, supra.) For similar cases involving business expenses, see Charleston National Bank, 20 T.C. 253 (1953), affd. 213 F. 2d 45 (C.A. 4, 1954); Dominion National Bank, 26 B.T.A. 421 (1932); Lock, Moore & Co., Ltd., 7 B.T.A. 1008 (1927); First Nat. Bank & Trust Co. cf Tulsa v. Jones, 143 F. 2d 652 (C.A. 10, 1944). But cf. United States v. Mellinger, 228 F. 2d 688 (C.A. 5, 1956), a case involving sec. 23(a)(2), I.R.C. 1939↩.
12. See footnote 1, supra.↩